## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

GENTRY BOLTON,     )
           )
      Petitioner, )  **CIVIL ACTION**
           )
v.          )  No. 05-3417-MLB
           )
RAY ROBERTS, WARDEN,   )
EL DORADO CORRECTIONAL FACILITY,[1] )
AND PHILL KLINE, KANSAS  )
ATTORNEY GENERAL,    )
           )
      Respondents. )

## MEMORANDUM AND ORDER

## 1.   INTRODUCTION

This case comes before the court on petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.)  The matter has been fully briefed and is ripe for decision.[2]  (Docs. 17, 19.)  The application is DENIED for reasons set forth herein.

On December 28, 1997, Shane Bree was working as a clerk at a

---

[1]  When petitioner filed his application for habeas corpus relief, he was incarcerated at the Lansing Correctional Facility and appropriately named David McKune, the warden of that facility as respondent.  Plaintiff has subsequently been moved to the El Dorado Correctional Facility and therefore the correct respondent is now the warden of the that facility, Ray Roberts.  In their Answer and Return, respondents moved to substitute Roberts as respondent for McKune. Petitioner did not object to this request and styled his Traverse in the amended manner.  The court grants respondents request and styles the case appropriately.  See Rumsfeld v. Padilla 542 U.S. 426, 434-35 (2004) (noting that the proper respondent in a habeas petition is the warden of the facility where the prisoner is being held).

[2]  Respondents initially concede exhaustion (Doc. 17 at 3).  28 U.S.C. § 2254(b)(3).  In their substantive analysis of petitioner's allegations, however, respondents assert petitioner's claim based on juror misconduct by juror Harrison has not been exhausted and is not subject to review.  The court will consider whether this particular claim is exhausted in its analysis, infra.

convenience store in Kansas City, Kansas when the convenience store was robbed and he was killed by a gunshot to the chest. The events were captured on the convenience store's surveillance videotape. (Br. of Pet'r in <u>State v. Bolton</u>, 271 Kan. 538, 23 P.3d 824 (2001) at 2-4.) Petitioner was charged in a second information and convicted of one count of first degree murder in violation of K.S.A. § 21-3401 and one count of aggravated robbery in violation of K.S.A. § 21-3427. (<u>Id.</u> at 9.)

During voir dire preceding his trial at the district court, petitioner's counsel objected to the state's use of its peremptory challenges as violating <u>Batson v. Kentucky</u>. The following colloquy between defense counsel and the trial court occurred:

> [DEFENSE COUNSEL]: Okay. I noticed that the State, I believe, struck six African Americans half of their challenges for cause [sic].
>
> THE COURT: What are the numbers of the jurors?
>
> [DEFENSE COUNSEL]: Number 16 was the State's strike, number 2 -
>
> THE COURT: Just give me the number of the jurors.
>
> THE COURT: Okay. Let me review those and see if there's a pattern.
>
> [DEFENSE COUNSEL]: Okay.
>
> THE COURT: I have reviewed the jurors that you mentioned and frankly have seen from my own notes obvious reasons for them to be removed from this panel. Based upon that and the other strikes from both sides, I can't see a pattern of discrimination displayed by the State in this case. I have reviewed each of your objections to these particular jurors with my own notes and I can find no pattern of discrimination whatsoever. And, therefore, I'm going to deny your Batson objections at this point.

A twelve-person jury with two alternates was ultimately seated and the

trial commenced.[3]

After the jury was released to deliberate, it requested to view the convenience store surveillance tape that had been admitted into evidence as an exhibit. Outside of petitioner's presence, but in the presence of his counsel and counsel for the state, the trial court ruled that a VCR should be set up in the jury room so that the jury could watch the videotape at its leisure. Thus, petitioner was not present at the time the ruling was made by the trial court or during the jury's viewing of the surveillance recording during its deliberations. (Br. of Pet'r in State v. Bolton, 274 Kan. 1, 49 P.3d 468 (2002) at 9-10.)

Also during juror deliberations, a juror realized that her automobile, which had been stolen several years previously, was the automobile that was used to drive to and from the convenience store the night the crimes occurred. Juror Newman disclosed this fact to the court once she recognized her stolen vehicle after closely examining the trial exhibits during the jury deliberations. The district court questioned juror Newman and discovered that Newman had

---

[3] On direct appeal, petitioner challenged the trial court's failure to require the state to articulate a race-neutral reason for their peremptory challenges. (Br. of Pet'r in State v. Bolton, 271 Kan. 538, 23 P.3d 824 (2001) at 18.) The Kansas Supreme Court agreed that the proper procedure for a Batson challenge was not followed and remanded for a proper hearing and determination on the Batson issue. State v. Bolton, 271 Kan. 538, 23 P.3d 824 (2001). At that hearing, the district court found that defense counsel had properly challenged the state's removal of the six jurors. The district court then heard argument from the state regarding its assertion of race-neutral reasons for the jurors' removal. The court ultimately concluded that petitioner had not shown purposeful discrimination by the state. The Kansas Supreme Court affirmed the ruling by the district court that there was no purposeful discrimination in the state's exercise of its peremptory challenges. State v. Bolton, 274 Kan. 1, 49 P.3d 468 (2002).

-3-

disclosed her realization to the other members of the jury. Newman was released from jury service and replaced with an alternate juror. The court then questioned and received affirmative assurances from the remaining jurors about their ability to remain fair and impartial. The court then released the jury to begin its deliberations anew. (Bolton v. State, No. 92-316, 2005 WL 1949899 (Kan. Ct. App. Aug. 12, 2005.)

## II.  ANALYSIS

This court's ability to consider collateral attacks on state criminal proceedings is circumscribed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the highly deferential standard set forth in the AEDPA, if petitioner's claim has been decided on the merits in a state court, a federal habeas court may only grant relief if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

> A state-court decision is contrary to established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state-court decision is an unreasonable application of federal law under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S.Ct. 1495. What is "reasonable" is determined under an objective test rather than by, say, determining whether a judge somewhere has so ruled. See id. at 409-10, 120 S.Ct. 1495.

-4-

<u>Bush v. Neet</u>, 400 F.3d 849, 851-52 (10th Cir. 2005).   An inherent limitation to review under § 2254 is that a habeas court will only consider alleged violations of <u>federal</u> law.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80 (1991).   Moreover, the court will not normally consider federal questions unless they have first been presented to the state courts.  <u>Picard v. Connor</u>, 404 U.S. 270, 277-78, 92 S. Ct. 509, 513 (1971); <u>but see</u> 28 U.S.C. § 2254(b)(2) (permitting <u>denial</u> on the merits, despite failure to exhaust state remedies).

**A.   Accused's Presence at Critical Stages of the Trial**

An accused defendant is entitled to be personally present at all critical stages of trial.  <u>Rushen v. Spain</u>, 464 U.S. 114, 117 (1983). A critical stage is one in which "a fair and just hearing would be thwarted by [defendant's] absence."  <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 108 (1934).   This right to be present does not, however, require a defendant's presence when it would be useless or only slightly beneficial.  <u>Id.</u> at 106-07.

Petitioner claims his due process rights were violated when the jury was allowed, after jury deliberations had begun and outside of his presence, to view the surveillance videotape that had been admitted into evidence.  In <u>Valdez v. Gunter</u>, 988 F.2d 91 (10th Cir. 1993), the jury was allowed during deliberations to twice listen to an audio tape that had been admitted into evidence and played to the jury at trial.   The Tenth Circuit held that because the tape had already been admitted as an exhibit, "whether to play the tape essentially went only to a legal issue concerning admitted evidence." <u>Id.</u> at 94.   Therefore, the court held it was not a critical stage of

-5-

the proceeding requiring the criminal defendant's presence and no due process violation occurred.   Id.   Like in Valdez, the jury in petitioner's case was only allowed to consider evidence it had already been exposed to during the trial, when petitioner was present. Petitioner claims his presence was necessary at all viewings of the videotape to counter the emotional impact of the videotape.

The surveillance videotape was admitted into evidence by the trial court as an exhibit and it was no violation of defendant's due process right to allow the jurors to view the admitted exhibit outside of petitioner's presence during their deliberations.   Petitioner's presence at that point, after the jury had already seen the videotape in open court in petitioner's presence, would have been "useless or only slightly beneficial."   The Kansas Supreme Court determined that it could not "be assumed that the jury's viewing of the tape again in the jury room compounded the emotional impact."   State v. Bolton, 274 Kan. 1, 5, 49 P.3d 468, 473 (2002).   The state court's conclusion that petitioner's due process rights were not violated on this claim fits squarely within established Supreme Court precedent and will not be disturbed.

**B.   Batson Challenge**

Petitioner asserts that his constitutional rights were violated in relation to his Batson challenge at voir dire.   In Batson v. Kentucky, the Supreme Court considered "[t]he standards for assessing a prima facie case in the context of discriminatory selection of the venire" in a criminal trial.   476 U.S. 79, 96 (1986).   The procedure for asserting a Batson challenge requires a criminal defendant to show "that the prosecutor has exercised peremptory challenges to remove

-6-

from the venire members of the defendant's race" and that this fact and "any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id. To satisfy the first step of the Batson challenge procedure, a defendant need not show that the peremptory challenge "was more likely than not the product of purposeful discrimination" but rather that "the totality of relevant facts gives rise to an inference of discriminatory purpose." Johnson v. California, 545 U.S. 162 (2005).

If the defendant makes out a prima facie case, the prosecutor is called upon to justify their exclusions with a race-neutral explanation. Batson, 476 U.S. at 98. The second step of the process "does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 768 (1995). The trial court must then make a determination whether the defendant has proven "purposeful discrimination." Batson, 476 U.S. at 98. The ultimate burden of persuasion "regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768. "The disposition of a Batson claim is a question of fact." Sallahdin v. Gibson, 275 F.3d 1211, 1225 (10th Cir. 2002). The AEDPA mandates that state court factual findings are presumptively correct and may be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In this case, the state court's factual findings regarding petitioner's Batson challenge are thoroughly articulated, reasoned, and not contrary to federal law. At voir dire, petitioner raised a prima facie Batson objection regarding six peremptory challenges by

the prosecution and the trial judge overruled his objection without following the appropriate procedure requiring a race-neutral explanation from the state. On direct appeal, the Kansas appellate court remanded petitioner's case for a full hearing and consideration of petitioner's challenge by the trial court. A hearing was then held. The Kansas Supreme Court summarized the Batson proceeding as follows:

> Juror 16, L. Richmond. At the Batson hearing, the prosecutor contended that Richmond was struck because she had returned late from a break. The trial transcript indicates that Richmond returned late from the lunch break during voir dire, claiming that she was unable to find a parking spot. The prosecutor asserted that Richmond was also struck because she was a church janitor and because she had family members involved in a shooting 2 years before voir dire (her brother had shot her mother). The prosecutor claimed to be especially concerned with how Richmond would react, under the circumstances, to seeing the surveillance videotape of the shooting in this case.
>
> The State also noted in its brief that Richmond, when asked during voir dire if she had any ill will against the criminal justice system, replied, "Well, kind of sort of." When asked to clarify her response, however, Richmond indicated that she did not harbor any ill will against the agencies and the system.
>
> Bolton asserted to the district court that his notes indicated that Richmond's brother had been in a mental institution 2 years prior to voir dire. Bolton also noted that Juror 34, P. Reed, who had not been struck from the panel, also had a family member who had had contact with law enforcement. Reed's husband had transported drugs prior to their marriage and had done time in prison.
>
> Juror 31, M. Berry. The prosecutor asserted to the district court that Berry was struck because she knew another juror on the panel, Juror 15, M. Smith. The prosecutor contended that he disapproved of having people on a jury who know each other. Berry was also allegedly struck because the prosecutor was concerned that

-8-

although he did not recognize Berry, she might at some point during the 5 day trial be influenced as a result of his having lived in the same neighborhood, through conversations with neighbors.

Bolton rebutted the prosecutor's explanation in part by claiming that another juror, Juror 28, A. Valdez, who was not struck, also knew another juror on the panel, Juror 14, M. Oropeza.

The State, in its brief, refutes Bolton's contention that jurors were treated differently, by alluding to the fact that the reason the State did not strike Valdez is because Oropeza had already been struck.  It cannot be determined from the record which party struck Oropeza from the panel.  The State contends the reason for removing a juror on the panel is negated when either juror is struck.  This reasoning is consistent with the prosecutor's assertion at the hearing that he did not like to have people on a jury who know each other.

It must be noted that Smith, unlike Valdez, did not serve on the final jury and was also struck by the State.  The State notes, however, that at the time Berry was struck, Smith was still a member of the panel.  The situation with Berry and Smith differed because Berry was struck for knowing Smith and then Smith was struck for a different reason. . . .

The State also points out in its brief that Berry made comments at voir dire that raised suspicion as to her ability to keep emotions and other outside influences from entering her decision.  When asked whether any juror did not feel he or she would be able to be fair and impartial with observers in the courtroom, Berry indicated she was feeling 'sympathy.'  Berry stated: 'At this time, I really feel that I could [sic] be impartial - I mean, I just don't think I could.  I just feel, therefore, a lot of emotion now and it's - I feel sick. . . . Sick, I don't - I feel that I don't want to do it.  I don't want to make-'

Later, when asked whether Berry could wait to hear all the evidence before deciding the case, Berry responded, 'I-I'm not sure.  I think I could, but I wouldn't want to.'  Berry also stated, however, that if she took an oath she would try to do her best to hear all the evidence before making her decision.

<u>Juror 12, E. Lasley.</u>  The prosecutor asserted that Lasley was struck because Lasley

-9-

indicated he had gone to school with an Ed Bolton and Lasley was unaware of whether Ed was a relative of Gentry Bolton. Bolton did not refute the State's basis for striking Lasley at the hearing.

In his brief, Bolton cites to the fact that Lasley was struck from the panel even though the prosecutor did not know if Ed Bolton and Gentry Bolton were related. The State asserts, however, that it is in the State's best interest to strike any person who might be good friends with a relative of a defendant.

Juror 15, M. Smith. The prosecutor asserted that Smith was removed because he had indicated he had a back problem. The trial was scheduled to last 5 days. The prosecutor claimed he thought it would be better to have people who were comfortable throughout the trial rather than take the chance of the need for additional recesses or a possible mistrial because of the back problems of this particular juror.

Bolton's counsel admitted that he did not have an independent recollection of whether the State or the trial court had sufficiently questioned Smith about how burdensome it would be for him to serve as a juror or whether the court had offered any alternative arrangements. Bolton contended, however, that the issue was not sufficiently explored to justify the State in using Smith's back problem as the reason for striking him.

During voir dire, Smith indicated he had back surgery about a year ago, was on social security disability as a result of his back injury, and that the bench on which he was sitting was hurting his back. Upon moving to the padded chairs he would be seated in if a member of the jury, Smith indicated that he would not have a problem, sitting during the trial.

The state asserts that attention and patience are important aspects for a juror and that the State should not be required to learn in the middle of trial that a juror is having back problems and may or may not have heard all the evidence.

Juror 32, M. Bryant. The prosecutor asserted that Bryant was struck from the panel because of a recent situation in which her granddaughter's father had been charged or had certain experiences with drugs. He also contended Bryant was struck because she was

retired from the Social Security Administration and because she was doing maintenance work at the Johnson County Juvenile Detention Center. The prosecutor stated that her position at the detention center put her in contact with criminally charged juveniles and made it impossible for the State to determine her position on individuals who might be similarly situated to the young defendant in this case. Bolton was over 18 years of age at the time.

Bolton contended the prosecutor had been referring to the situation in which Bryant's granddaughter's father was charged with a drug offense and for which Bryant had had some contact with the father's attorney. Bolton cited the fact that the husband of Juror 34, P. Reed, had been also been [sic] arrested on a drug offense and served time prior to their marriage, but that Reed had not been struck by the State. It must be noted that the record does not indicate Reed's race.

The State accurately points out in its brief that seven persons on the jury other than Bryant had either been, or knew someone close to them who had been, charged with a crime. Two of these individuals, in addition to Reed, knew someone who had been charged with a drug-related offense. Of all these individuals, all but Reed and one other, C. Boland, were struck by the State. The defense struck Boland. The State asserts that Reed differs from the others because her husband was charged, convicted, and served time for his offense prior to Reed knowing him. The other jurors were all related or friends at the time the charge was made.

Bolton points out in his brief that Bryant was not employed by the Johnson County Juvenile Detention Center, but instead that it was Juror R. Hicks' husband who was so employed. The State concedes this point in its brief, asserting that during voir dire the note was incorrectly made beneath Bryant's name. The State claims Bryant and Hicks were seated next to each other on the prosecution's worksheet. . . .

Juror 4, L. Green. The prosecutor noted to the court that Green was a 'fairly young black male' and asserted that Green was removed because he wore hair braids. At the time the crime was committed in this case, the defendant had also worn hair braids. The prosecutor claimed that he was concerned that because no other members of the panel wore hair braids, Green would bond with

the defendant, or Green might develop a concern about possible negative connotations that might be drawn about individuals with hair braids. The prosecutor rationalized that he was down to his eleventh strike at this point, stating that he had to start looking at 'stereotypes' and that hair braids 'stuck out.'

Bolton argued that the presence of hair braids was not a race-neutral reason for striking Green. He claimed that this bordered on being a racial argument because Green had this particular type of hair because he is African American and because the defendant and Green shared this same racial characteristic.

In its brief, the State asserts this was not a racial characteristic, but a characteristic that both the defendant and Green happened to share. The State likens it to a tattoo, ear piercing, or certain style of clothing in attempting to show that the race of the juror was not determinative. The State contends that the sole issue at trial was identity, and that because Green was the only member of the jury with hair braids, he or other jurors might have been affected if testimony came in that the defendant wore hair braids.

State v. Bolton, 274 Kan. 1, 10-15, 49 P.3d 468, 476-78 (2002). As set out above, the court fully considered the explanations propounded by the prosecution and petitioner before making its ultimate ruling that petitioner had not proven purposeful discrimination. The trial judge based its ruling on "all the relevant factors" and noted that of the twelve jurors that sat on the jury, seven were African American, one was Hispanic, and four were Caucasian. The court determined the prosecution's reason for challenging juror Green was "borderline," but that when viewed with all the other factors and the credibility of the prosecutor, the strikes were not racially motivated. The court noted that the prosecutor had six additional strikes he could have used to remove more African Americans from the final jury panel but did not do so. The court considered petitioner's

"similar circumstances" evidence but did not find it conclusive.

These findings by the trial court, upheld by the Kansas Supreme Court, are reasonable and fully in line with federal precedent under Batson.  "Given that, because the trial court's findings on the issue of discriminatory intent largely turn on an evaluation of the prosecutor's credibility, they are factual findings that are presumptively correct under the AEDPA.  Evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province."  Saiz v. Ortiz, 392 F. 3d 1166, 1180 (10th Cir. 2004)(internal citations and quotations omitted); see also United States v. Abdush-Shakur, No. 05-3147 (10th Cir. Oct. 4, 2006)(stating that the fact that the government did not exclude all minority members of the jury was a factor that "tips the scales against finding intentional discrimination").  Because the Kansas courts analyzed petitioner's claims in a fully reasoned opinion, and because that reasoning does not contradict Supreme Court precedent, petitioner's claim based on his Batson challenge fails.

**C.  Juror Misconduct**

1.  Juror Bias Caused by Juror Newman.

Petitioner's complaint alleges that his right to a fair and impartial jury was violated because of the bias of juror Newman that was allowed to taint the impartiality of the other jurors.  The Sixth Amendment to the U.S. Constitution affords an accused the right to trial by an impartial jury.  The Supreme Court has defined an impartial trier of fact as "a jury capable and willing to decide the case solely on the evidence before it."  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984); Smith v. Phillips, 455 U.S.

-13-

209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). According to Smith, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. at 215, 102 S. Ct. at 945.

In this case, once the trial court was made aware of juror Newman's relationship with the case before the court, she was immediately excused. Unfortunately, Newman had already disclosed to the other jurors her connection to the stolen car used in the robbery and homicide at the convenience store. The trial court, however, questioned each of the remaining jurors individually regarding juror Newman's disclosure and its effect on their ability to remain fair and impartial. Each juror responded that they could remain fair and impartial and there was no reason for the trial judge to discredit the jurors' responses. The trial court conducted this examination in counsels' and petitioner's presence and gave counsel the opportunity to make additional inquiries of the jurors.

Moreover, unlike Smith, where the Supreme Court found that a hearing conducted after the trial did not violate due process, in this case the hearing was conducted during the trial, where all parties had the opportunity to probe juror bias before a verdict was ever rendered. Petitioner had the burden to demonstrate bias on the part of any juror. See Smith, 455 U.S. at 215. Further, "not every incident [involving bias] requires a new trial. The test is whether . . . the misconduct has prejudiced the defendant to the extent he has

-14-

not received a fair trial." <u>United States v. McHorse</u>, 179 F.3d 889, 904 (10th Cir. 1999).  The record shows that the trial court complied with the mandate from <u>Smith</u> to hold a hearing on the issue of juror bias.  Having done so, the state court's determination that no bias existed, buttressed by counsel's agreement to the same effect, is a factual conclusion entitled to deference.  28 U.S.C. § 2254(e)(1).

In an effort to rebut this factual finding, petitioner argues that the reviewing courts' interpretation of one of the jurors responses during the court's examination of the individual jurors for bias was incorrect.  The trial court's examination of juror Hunt was as follows:

> THE COURT: Thank you very much, ma'am.  Ms. Hunt, it's come to the Court's attention that Juror Newman related to the rest of you jurors that she thought the car in the photographs was her stolen car –
>
> JUROR HUNT: Yes.
>
> THE COURT:  – is that correct?
>
> JUROR HUNT: Um-hum.  That's what she said.
>
> THE COURT: Okay.  My question to you now is despite that information, can you remain a fair and impartial juror in this case to the defendant and to the State of Kansas?
>
> JUROR HUNT: Sure.
>
> THE COURT: You understand that that has no bearing –
>
> JUROR HUNT: That has nothing –
>
> THE COURT:  – nothing to do with this case?
>
> JUROR HUNT:  – you know.
>
> THE COURT: Okay.
>
> JUROR HUNT: Who took her car has got nothing to

-15-

do with this.

THE COURT: Absolutely.  Do either of you two have any questions?

[THE STATE]: No, sir.

[DEFENSE COUNSEL]: No, sir.

Petitioner attempts to support his allegation of juror impartiality by phrasing juror Hunt's response of "who took her car has got nothing to do with this" as a question, rather than a statement.  Contrary to petitioner's assertion, the transcript, as the sentence is expressly prepared and taken as a whole in the context of the trial court's examination of juror Hunt, does not coincide with petitioner's interpretation.  Petitioner has not rebutted the state court's factual findings regarding juror bias.  This court determines those findings to be reasonable in light of applicable federal law.

2.  Juror Misconduct by Juror Harrison.

Petitioner next alleges that juror Harrison failed to affirmatively answer one of the questions posed to the jury panel during voir dire.  In their answer, respondents assert that this claim by petitioner has not ever been raised to the state courts and is therefore procedurally defaulted.  Because 28 U.S.C. § 2254(b)(2) permits _denial_ of a claim on the merits despite failure to exhaust state remedies, the court will review this claim on its merits because it can more quickly dispose of the claim in this manner, rather than on procedural grounds.

Regarding this claim, petitioner's complaint alleges in its entirety:

But the misconduct of juror Harrison should also be considered under the petitioner's

-16-

argument[.] [J]uror Harrison - as she also failed
to acknowledge on voir dire when the state asked
the jury panel in whole: if they knew someone
that has been charged with a felony crime.  (R
XII 114-15) Juror Harrison knew Kevin Garrett
that was charged with shooting up her house which
just happen to be one of the states witnesses in
the petitioner's murder case.  (Pumpkin Davis)
babys father who shot up the juror Harrison house
(R XIV 668) When this information came before the
attention of the court neither the state, defense
counsel nor the judge recommended that juror
Harrison be removed.  Although the state, stated:
It's just something had I known, I probably would
have struck her with a peremptory.   Juror
Harrison remained on the jury and who ultimately
participated in the guilty verdict.

(Complaint exh. 3 at 2.)  Petitioner's allegation of juror misconduct

is based upon a flawed premise.   Juror Harrison did not fail to

truthfully respond to the question proposed at voir dire.   The

question petitioner directs the court to was:

[W]hether any of you have any relatives, close
friends, yourself or someone who's close enough
to you that you think we should just talk about
it that has ever been charged with a felony
crime, yourself, your relatives, a close friend
of yours or someone that just has a sufficient
enough relationship that you think we should talk
about it that's ever been charged with a felony
crime?

(R. XII 115.)

Juror Harrison disclosed to the court, once she became aware of

the fact, that she recognized the name of the father of the baby of

a woman testifying who had been charged in connection to a drive-by

shooting of her home two years previously.   Thus, petitioner's claim

of juror misconduct based on juror Harrison failing "to acknowledge"

at voir dire that she knew "someone charged with a felony" fails on

its face.  The question posed on voir dire was not whether any members

of the panel knew "someone" who had been charged, but whether they

knew a "relative, close friend, or someone with a sufficient relationship" that had been charged with a felony.  An allegation of juror misconduct at voir dire requires the petitioner to show "that the juror failed to honestly answer a material question on voir dire and that a correct response would have provided a valid basis for a challenge for cause."  <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 556 (1984).  Petitioner has not shown that juror Harrison failed to honestly answer a question at voir dire and his claim based on juror misconduct is therefore easily disposed of.

Further, even if petitioner was alleging juror bias by juror Harrison, rather than misconduct at voir dire, this claim would fail as well.  Regarding juror bias, "the appropriate inquiry [for the court] . . . is whether either actual bias existed or whether the circumstances compel an imputation of inherent bias to the juror as a matter of law."  <u>United States v. McHorse</u>, 179 F.3d 889, 904 (10th Cir. 1999)(internal citations and quotations omitted).  As stated above, even if juror Harrison was biased, "not every incident [involving bias] requires a new trial.  The test is whether . . . the misconduct has prejudiced the defendant to the extent he has not received a fair trial."  <u>Id.</u>

Juror Harrison made a full disclosure to the court of her connection to the witness immediately upon becoming aware of it.  In addition, when juror Harrison disclosed to the court that she recognized the name of the witness's baby's father, she assured the court she would not share her knowledge with the other jurors and that her knowledge would have no effect on her ability to judge the witness's credibility because she did not know the witness and it had

-18-

nothing to do with the testifying witness.  The factual finding by the trial court that juror Harrison could remain impartial is reasonable.  See Patton v. Yount, 467 U.S. 1025, 1036 (1984) (state court determinations of impartiality are entitled to the presumption of correctness due factual findings).

**D.  Ineffective Assistance of Counsel**

Petitioner asserts his trial counsel was ineffective for 1) failing to request a mistrial upon discovery by the trial court of juror Newman's connection with the stolen car used in the robbery and homicide; and 2) failing to fully investigate the remaining jury members for bias after juror Newman was removed.

A claim for ineffective assistance of counsel in violation of the Sixth Amendment requires petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different.  Williams v. Taylor, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 1511-12, 146 L. Ed. 2d 389 (2000); Strickland, 466 U.S. at 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).   In evaluating the performance of trial counsel, the Supreme Court provided the following guidance:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome

> the presumption that, under the circumstances,
> the challenged action "might be considered sound
> trial strategy." See Michel v. Louisiana, supra,
> 350 U.S., at 101, 76 S. Ct., at 164.
>
> . . .
>
> Thus, a court deciding an actual ineffectiveness
> claim must judge the reasonableness of counsel's
> challenged conduct on the facts of the particular
> case, viewed as of the time of counsel's conduct.
> A convicted defendant making a claim of
> ineffective assistance must identify the acts or
> omissions of counsel that are alleged not to have
> been the result of reasonable professional
> judgment.  The court must then determine whether,
> in light of all the circumstances, the identified
> acts or omissions were outside the wide range of
> professionally competent assistance.  In making
> that determination, the court should keep in mind
> that counsel's function, as elaborated in
> prevailing professional norms, is to make the
> adversarial testing process work in the
> particular case.  At the same time, the court
> should recognize that counsel is strongly
> presumed to have rendered adequate assistance and
> made all significant decisions in the exercise of
> reasonable professional judgment.

Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66 (emphasis

added).  Thus, under this standard, counsel's performance is presumed

competent, and petitioner bears the burden of rebutting that

presumption.  In reviewing petitioner's claims, the Kansas Court of

Appeals did not cite Strickland; instead, the state court relied on

state decisions, but the standards set forth in those decisions are

the Strickland standards.  Bolton v. State, No. 92-316, 2005 WL

1949899, at *2 (Kan. Ct. App. Aug. 12, 2005).

In support of his ineffective assistance of counsel claim,

petitioner asserts:

> [T]rial counsel was ineffective for [failing] to
> request a mistrial despite the removal of juror
> [Newman] because the seed had been planted in the
> other juror's minds that was highly prejudicial

to the defendant.   Had counsel moved for a
mistrial, investigated, or questioned the jurors,
there may well have been information regarding
the misconduct that would have compelled a new
trial - defense trial counsel asked no relevant
questions of the jurors, either at trial or in a
post trial motion for a new trial, in order to
determine the explanation for the nondisclosure
and its effects of the other jurors.   Trial
counsel made [no] effort to interview or to
independently determine[] the impact of the
dismissed juror on the panel members who
ultimately rendered the verdict.

In response to these claims, the Kansas Court of Appeals determined that petitioner's trial counsel's representation was not deficient and, even assuming that it was, petitioner had shown no prejudice.  The Kansas Court of Appeals noted that Kan. Stat. Ann. § 22-3423[4] sets forth the grounds for granting a mistrial in a criminal case.  The court found that petitioner did not establish any facts to support any of the statutory grounds for a mistrial because juror

---

[4]   Section 22-3423 states, in pertinent part:

(1) The trial court may terminate the trial and
order a mistrial at any time that he finds
termination is necessary because:
(a) It is physically impossible to proceed
with the trial im conformity with law; or
(b) There is legal defect in the proceedings
which would make any judgment entered upon
a verdict reversible as a matter of law and
the defendant requests or consents to the
declaration of a mistrial; or
(c) Prejudicial conduct, in or outside the
courtroom, makes it impossible to proceed
with the trial without injustice to either
the defendant or the prosecution; or
(d) The jury is unable to agree upon a
verdict; or
(e) False statements of a juror on voir dire
prevent a fair trial; or
(f) The trial has been interrupted pending
a  determination  of  the  defendant's
competency to stand trial.

Newman was excused from the jury, and neither the alternate juror nor the remaining eleven jurors gave any indication that the deliberations had been tainted in any way before juror Newman was excused.   The court found petitioner's "conclusory allegation" that trial counsel should have questioned the jurors when the court examined them insufficient.   Petitioner suggested no evidence that the jurors did not respond truthfully to the judge's questions about the impact of juror Newman's disclosure to them.   Regarding prejudice, the Kansas Court of Appeals found that, even if trial counsel's performance was deficient, petitioner had put forth no evidence that the jury was tainted.   The court also found nothing to suggest that the outcome of the trial would have been different and stated "[t]he evidence against Bolton was overwhelming.   The ownership of the automobile he drove to the scene of the crimes was irrelevant."

    The question presented here is whether the Kansas Court of Appeals' conclusion was reasonable in light of <u>Strickland</u>.   The fact that the jurors learned the true owner of the stolen car that was driven to the convenience store, which was not an issue in the case, is not evidence of bias.   Trial counsel was not ineffective for not moving for a mistrial or not further investigating the matter–there were no grounds for a mistrial and the examination by the court was wholly sufficient to determine the benign nature of the revelation by juror Newman to the rest of the jury.   <u>See</u> <u>United States v. McVeigh</u>, 153 F.3d 1166, 1185 (10th Cir. 1998) (recognizing deference should be given to the jurors' declarations of impartiality and the trial court's credibility determinations that the jurors' declarations are sincere).   Petitioner has put forth no evidence of actual bias nor any

-22-

evidence to "compel an imputation of inherent bias as a matter of law." McHorse, 179 F.3d at 904.

Each of the jurors remaining after juror Newman was excused individually expressed to the court that they had not become biased and fully realized that the car used the night of the robbery and homicide was not an issue in the case and had no bearing on their determinations. A motion for a mistrial by defense counsel would have been meritless. See Arizona v. Washington, 434 U.S. 497, 516 (1978) (stating that to avoid double jeopardy, a mistrial should be granted only in cases where a "high degree of necessity" to meet "the ends of public justice" is shown). Thus, the Kansas Court of Appeals' finding that petitioner failed to establish the fact of trial counsel's ineffectiveness was not an unreasonable factual determination.

Likewise, the court agrees with the state appellate court's assessment of Strickland's prejudice prong. Even if petitioner's counsel had further questioned the remaining jurors, there is no evidence that any of them were biased or lacked the capacity to remain fair and impartial while serving on the jury. Each juror was individually questioned by the court about the effect of juror Newman's revelation to them and each affirmed their ability to remain fair and impartial. The Kansas Court of Appeals' conclusion that trial counsel's performance at trial was not prejudicial to petitioner was not an unreasonable application of Strickland.

## IV.  CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus is DENIED. A motion for reconsideration is neither invited nor encouraged. Any such motion shall not exceed three

-23-

double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (D. Kan. 1992).  No reply shall be filed.  Identical requirements and restrictions shall apply to any application for certificate of appealability or any other submission, however styled, directed to this Memorandum and Order.

     IT IS SO ORDERED.

     Dated this <u>  11th  </u>  day of October 2006, at Wichita, Kansas.


<u>S/ Monti Belot               </u>

Monti L. Belot
UNITED STATES DISTRICT JUDGE